UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
                                                                  :
MUNICIPAL CREDIT UNION,                                           :
                                                                  :
                                    Plaintiff,                    :   **MEMORANDUM**
                                                                  :   **DECISION AND ORDER**
                  - against -                                     :
                                                                  :   14 Civ. 4895 (BMC)
QUEENS AUTO MALL, INC. and ANDREAS                                :
STYLIANOU, also known as Andrew Stylianou,                        :
                                                                  :
                                    Defendants.                   :
                                                                  :
----------------------------------------------------------------- X

**COGAN**, District Judge.

This case is before me for a determination of damages following default judgment. See Mun. Credit Union v. Queens Auto Mall, Inc., No. 14-cv-4895, 2014 WL 6870960 (E.D.N.Y. Dec. 5, 2014). This is a trademark infringement action in which it was never disputed that defendants prominently displayed a distinctive service mark belonging to plaintiff, a consumer finance company, for a period of several years, on the awning above defendants' used car dealership. At the parties' joint request, I have proceeded on written proofs and briefing to determine plaintiff's damages and entitlement to fees, costs, and injunctive relief. See Fed R. Civ. P. 55(b); Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc., 109 F.3d 105 (2d Cir. 1997). Plaintiff seeks $2,000,000 in statutory damages; $1,640 in court costs; and $88,064.62 in attorney's fees pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117, as well as a permanent injunction pursuant to § 34 of the Lanham Act, 15 U.S.C. § 1116.

For reasons set forth below, I find that plaintiff is entitled to an award of $330,000 in statutory damages, $1,640 in costs, and $70,612.50 in attorney's fees. In addition, a permanent injunction against defendants' further use of plaintiff's service mark is appropriate.

**BACKGROUND**

Plaintiff Municipal Credit Union ("MCU") is a members-only credit union established in 1916 with branches in New York City's five boroughs, having approximately 400,000 members. Plaintiff owns a federally-registered service mark consisting of the letters "MCU" with a silhouetted cityscape forming the bottom portion of the "M," as shown here:



Plaintiff uses the mark to promote its products and services through print materials, online marketing, billboards, and subway advertising. The mark is also featured in MCU branches and at MCU Park, a minor league baseball stadium in Coney Island. Over the past five years, plaintiff has spent over $11 million on advertisements featuring the mark.

Plaintiff offers automobile financing as a service to its members. Plaintiff finances cars that are less than six years old and have less than 60,000 miles. Plaintiff selectively partners with dealerships to offer this service and "will move quickly to sever the relationship" if a partner dealership develops a bad reputation. Plaintiff's partner dealerships prominently display the mark. Plaintiff books an average of 117 new loans per year, each of which generates several thousand dollars in interest over its lifetime.

Defendant Queens Auto Mall, Inc. ("Queens Auto") is a used car dealership. Defendant Stylianou is the owner of Queens Auto. Defendant Stylianou also owns a company called MCU

Auto Funding Corporation ("MCUAF"), which he founded in February 2009. MCUAF, which is not a party to this lawsuit, is unrelated to MCU.

In 2009, after forming MCUAF, Stylianou commissioned an awning for Queens Auto to be designed by a third party company. Stylianou explained at his deposition that "I gave [the designer] the name of my corporation, and I said make me an awning[,] and that is what he created." Stylianou admits that he approved the design of the awning for installation over Queens Auto. From 2010 through August 2014, Queens Auto displayed the awning over its entrance next to the words "Auto Funding" and "Auto Loans" and above the words "Credit Union," as shown here:



Stylianou admits that he was "familiar with MCU" and knows they "make loans." Defendants did not print the mark on any other promotional materials.

In August 2010, plaintiff notified defendants via a cease and desist letter that they were infringing the mark and requested that the awning be removed. In May 2014, the awning had not been removed, and plaintiff sent another cease and desist letter.[1] Following each letter, Stylianou contacted his accountant to ask whether Queens Auto was in "good standing," but otherwise took no action. Stylianou did not call his lawyer because, according to Stylianou, he charges "an arm and a leg." At some point between May and August 2014, defendants blacked

---

[1] Plaintiff explains that the four year gap between cease and desist letters was a result of plaintiff's belief that defendants removed the awning in 2010. Plaintiff apparently learned that the awning was still in place in 2014.

out the words "Credit Union" beneath the mark on the awning, but otherwise the mark remained in place. In August 2014, defendants removed the awning.

During the period that the awning was in place, defendants sold and financed 3,048 cars. Of those, 440 met plaintiff's financing criteria. Defendants' tax returns reflect a net operating profit of $765,378 during that time, after overhead, which comes out to about $251.11 per car.

Defendants have twice been investigated and twice settled with the New York City Department of Consumer Affairs – once in 2000 resulting in a $30,000 fine, and once in 2009 resulting in a $425,000 fine – for attempting to represent affiliation with the government by advertising Queens Auto with aliases such as "Federal Auto Auction," "New York State Auction," and the like.

## DISCUSSION

### I.

Liability attaches upon a defendant's default so long as the well-pleaded allegations in the complaint give rise to liability. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61 (2d Cir. 1981). To succeed in establishing liability for infringement under the Lanham Act, a plaintiff must prove that he owns a valid protectable trademark; that the defendant used the trademark in commerce and without consent; and that there was a likelihood of consumer confusion. See 1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400 (2d Cir. 2005). When determining liability from default, a district court should accept as true "all of the factual allegations of the complaint, except those relating to damages." Au Bon Pain Corp., 653 F.2d at 66. Additionally, the non-defaulting party "is entitled to all reasonable inferences from the evidence offered." Id.

Liability is easily established in this case. It is uncontroverted that plaintiff owns a federally registered service mark, and that defendants used an identical mark without plaintiff's

4

consent. Likelihood of consumer confusion is typically examined by reference to the so-called Polaroid factors. See Polaroid Corp v. Polarad Elecs. Corp., 287 F.2d 492 (2d. Cir. 1961). However, application of the Polaroid factors is unnecessary where use of an identical or "counterfeit" mark is at issue, because such use is "inherently confusing," and so "consumer confusion is presumed." C=Holdings B.V. v. Asiarim Corporation, 992 F. Supp. 2d 223, 240-41 (S.D.N.Y. 2013) (internal quotation marks omitted). Because there is no dispute in this case that the mark used by defendants is identical to the mark in suit, it can be presumed that defendants' use of the mark created a likelihood of consumer confusion. Thus, defendants are liable for infringement under the Lanham Act based on their default.

## II.

Under § 35 of the Lanham Act, in cases involving counterfeit (*i.e.*, identical) marks, a plaintiff has the option of seeking actual or statutory damages, but not both. See Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83 (2d Cir. 2012); 15 U.S.C. § 1117. Here, plaintiff has elected to receive statutory damages. Section 35 provides that a statutory damage award should be "not less than $1,000 or more than $200,000 per counterfeit mark," 15 U.S.C. § 1117(c)(1), or "if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(2). Whether defendants' infringement was willful is therefore a threshold inquiry.

    *A.    Willful Infringement*

My Order granting default judgment suggested that this stage of the case was defendants' opportunity to argue that their conduct was not willful, but their opposition papers contain no serious argument to that effect. Moreover, even if defendants cannot be said to have expressly

5

conceded willfulness (as it is at least disputed in passing), "many courts in [the Second Circuit] treat a default as evidence of willfulness for the purposes of determining statutory damages." See Rolls-Royce PLC v. Rolls-Royce USA, Inc., 688 F. Supp. 2d 150, 157 (E.D.N.Y. 2010) (collecting cases). Under that view, defendants' default alone is sufficient to entitle plaintiff to the enhanced statutory damages cap.

Whether or not that presumption is fair in every case, it makes sense here, because the record is flush with evidence of defendants' intent to trade on plaintiff's goodwill. In particular, a cease and desist letter necessarily puts a defendant on notice that its conduct may constitute infringement. See New York State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs., Inc., 79 F. Supp. 2d 331 (S.D.N.Y. 1999). When a defendant is on notice that its actions likely constitute infringement, it must take "significant affirmative steps to ensure that its conduct would not constitute infringement," such as contacting counsel. Id. at 349-50.

Here, defendant Stylianou created a corporation, MCUAF, whose name incorporates plaintiff's trade name. Of course, that is not the conduct at issue, but it is relevant to defendants' *scienter* that the similarity is not a coincidence – specifically, defendants have admitted that the letters in MCUAF's name "were intended to compete with 'MCU Credit Union' when consumers searched on line for 'MCU Credit Union.'" After creating MCUAF, Stylianou commissioned an awning to be designed and installed over Queens Auto, and that awning design plainly featured plaintiff's mark.[2] Defendants contend that MCUAF was created as a vehicle for inventory financing, but the awning was placed over the entrance to defendants' dealership. These circumstances, even without more, are strong evidence of willful infringement. Tellingly,

---

[2] The mark's inclusion in the awning design may evidence the designer's own confusion and likely belief that MCUAF and MCU were related. This does not excuse defendants' adoption of the mark, of course.

in fact, in conceding that plaintiff is entitled to an award of attorney's fees (discussed further below), defendants appear to admit that the award is justified by their "reckless conduct."

But there is even more direct evidence of willfulness. Defendants received two cease and desist letters from plaintiff, in August 2010 and May 2014. Defendants did not remove the awning, nor did they take "significant affirmative steps" at that point to ensure that their conduct was lawful. (It is of no moment that Stylianou called his accountant, as he admits that he had a lawyer at the time. I do not believe that Stylianou, who was operating a business with eight-figure revenues during this period, was so unsophisticated as to have thought that his accountant was the person to ask about his potential liability for trademark infringement.)

Following further demands from plaintiff, Stylianou took the minimal step of obscuring the words "Credit Union" beneath the mark, but otherwise left the mark in place. Only in August 2014 – at or around the same time as plaintiff filed this case – did defendants remove the awning. This lackadaisical response is more than sufficient evidence of willfulness.

In short, defendants' default and tacit concession of willfulness, Stylianou's approval of the awning design, defendants' disregard of plaintiff's cease and desist demands and continued infringement of the mark over a five year period, and Stylianou's casual investigation following both cease and desist letters is sufficient to establish willfulness, entitling plaintiff to the heightened statutory damages cap of $2,000,000 provided for by section 35 of the Lanham Act.

### B. Calculating Statutory Damages

Defendants' willful infringement entitles plaintiff to an award up to $2,000,000, but I must still determine the appropriate amount of the award within that constraint. "[T]he pertinent considerations in deciding the amount of such an award encompass both the degree of the defendant's culpability and the extent of the injury caused." Polo Ralph Lauren, L.P. v. 3m

7

Trading Co., Inc., No. 97 Civ. 4824, 1999 WL 33740332, at *5 (S.D.N.Y. April 19, 1999). Relevant factors include "the profits reaped and the expenses saved by the infringer, the revenues lost by the plaintiff, the value of the [mark], the need to deter potential infringers, the degree of willfulness or the innocence of the defendant, the defendant's cooperativeness in providing information relevant to proof of profits and losses, and the need to deter the defendant from future misconduct." Id. (citing Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc., 807 F.2d 1110, 1117 (2d Cir. 1986) (assessing statutory damages under the Copyright Act)).

In addition, where possible, statutory damages should replicate actual damages. See Rolls-Royce PLC, 688 F. Supp. 2d at 157-58 ("[E]vidence showing the extent of the defendant's sales can . . . inform the determination of statutory, as well as actual damages."); see also C=Holdings B.V., 992 F. Supp. 2d at 249 ("[T]he Court may consider actual damages in determining a statutory damages award"); Chanel, Inc. v. Schwartz, No. 06-cv-3371 (BMC), 2007 WL 4180615, at *8 (E.D.N.Y. Nov. 19, 2007). Thus, because there is at least some factual basis for determining actual damages in this case, I will use them as a measure for determining statutory damages.

Pursuant to § 35, actual damages may be awarded "equal to (1) defendant's profits, (2) any damages sustained by plaintiff, and (3) costs of the action." Louis Vuitton Malletier S.A., 676 F.3d at 105 (quoting 15 U.S.C. § 1117(a)). With respect to the first measure, a plaintiff is entitled to all of a defendant's profits from proven sales "unless the defendant can show 'that the infringement had no relationship' to those earnings." George Basch Co., Inc. v. Blue Coral, Inc., 968 F.2d 1532, 1539 (2d Cir. 1992).

Statutory damage awards should be both compensatory and significant enough to discourage future wrongful conduct by the individual defendant and other potential would-be

infringers. Yurman Design Inc. v. PAJ, Inc., 262 F.3d 101, 113-14 (2d Cir. 2001). Although a statutory damage award may "exceed actual damages, an award of statutory damages [should] not constitute a windfall for prevailing plaintiffs." Rolls-Royce PLC, 688 F. Supp. 2d at 157.

Even so, statutory damages do have a punitive aspect. Thus, the amount of actual damages informs, but does not constrain, a statutory damage award. See C=Holdings B.V., 992 F. Supp. 2d at 249. In fact, because an award of actual damages under § 35(a) can be trebled in a case of willful infringement, it has been called an "unadventurous corollary" of that statutory trebling provision to do the same thing in statutory damages cases, in order to give effect to the punitive aspect of statutory damages. E.g., Malletier v. Artex Creative Int'l Corp., 687 F. Supp. 2d 347, 357 (S.D.N.Y. 2010).

Finally, if the amount of actual damages is uncertain (to the extent it is taken into account), courts may make reasonable assumptions in calculating statutory damages. See Century 21 Real Estate LLC v. Paramount Home Sales, Inc., No. 06-cv-2861, 2007 WL 2403397, at *5 (E.D.N.Y. Aug. 20, 2007) (applying a statutory damages formula that was "speculative" but nonetheless "reasonable and appropriate").

Applying these principles to this case requires some imagination, because plaintiff has not provided a workable measure of its own lost profits.[3] From the evidence before me, disgorgement of defendants' profits is the only reasonable measure of actual damages that is available. That is appropriate here, of course, because defendants' infringement was willful. See George Basch Co., 968 F.2d at 1540.

---

[3] Plaintiff suggests its lost profits can be determined by reference to the business it *did* conduct during the period of defendants' infringement. Plaintiff fails to explain why this formula would be an accurate or even a reasonable measure of damages.

9

Defendants earn money on each car sale from the vehicle resale price and by receiving a "cut" of the interest that banks receive by financing consumer sales. Defendants' earnings are in the record, but it cannot be said that every dollar of defendants' profit is attributable to their infringing conduct, because they obviously earn some portion of their profits from the markup on the price of the cars, and not from arranging financing. It was incumbent on defendants to show that their "infringement had no relationship" to their earnings, however. See George Basch Co., 968 F.2d at 1539 (quoting Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203 (1942)). For example, if defendants had proffered evidence of the proportion in which their profits are attributable to resale as opposed to their "cut" of financing revenue, plaintiff's damage award could potentially have been discounted by that proportion to better reflect those profits attributable to the infringement. But defendants did not make any such showing.

Nevertheless, to avoid creating an unjust windfall, I will make a different assumption – that is likely to have a similar impact on the result – in defendants' favor, and will not consider profits obtained from sales that plaintiff would not have been willing to finance itself. See George Basch Co., 968 F.2d at 1539 ("Historically, an award of defendant's profits has also served as a rough proxy measure of plaintiff's damages.").

With these limitations in mind: During the relevant period, defendants sold and financed 3,048 cars and earned an average profit of $251.11 per car, for a total profit of $765,378.[4] Of those 3,048 cars, 440 met MCU's financing criteria. Thus, only 440 of defendants' sales will be considered in determining defendants' profits. While "speculative" to a degree, these assumptions are "reasonable and appropriate" under the circumstances. Taking defendants'

---

[4] Plaintiff places this amount higher, based on defendants' gross revenue per car sold, but the accepted method of calculating lost profits is to deduct overhead expenses and costs. See Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co., 630 F. Supp. 2d 255 (E.D.N.Y. 2008).

profit per vehicle in the amount of $251.11 and multiplying it by 440 eligible vehicle sales, a rough measure of plaintiff's actual damages is $110,488.40. Trebling this amount to reflect defendants' willful infringement, and rounding down, I find that the appropriate measure of statutory damages is $330,000.

This award is in the order of magnitude of defendants' annual profits during this period, and is within the range of settlements that defendants have made with the Department of Consumer Affairs. It is also a small fraction of the revenue that defendants have earned while willfully infringing – for over half a decade – a well-known service mark that plaintiff has spent millions of dollars promoting. This award should appropriately deter defendant (and others), and compensate plaintiff, without creating an unjust windfall.

**III.**

Plaintiff seeks a permanent injunction to prevent defendants from using the mark, and defendants do not oppose. A district court has authority under the Lanham Act to grant injunctive relief to protect a plaintiff's trademark rights. See 15 U.S.C. § 1116. A court may grant a permanent injunction following a default judgment so long as the moving party shows that "it meets the prerequisites for issuance of an injunction." Harris v. Fairweather, No. 11 Civ. 2152, 2012 WL 3956801, at *9 (S.D.N.Y. Sept. 10, 2012). Specifically, plaintiff "must demonstrate (1) actual success on the merits and (2) irreparable harm." Id. Plaintiff has established success on the merits due to defendants' default. See id.

Irreparable harm is established where "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused." Lobo Enters., Inc. v. Tunnel, Inc., 822 F.2d 331, 333 (2d Cir. 1987). Consumer confusion is presumed

11

in cases where an identical mark is at issue. C=Holdings B.V., 992 F. Supp. 2d at 241. Plaintiff is therefore entitled to permanent injunctive relief.

**IV.**

The Lanham Act allows a prevailing party to recover costs of the action and, in "exceptional cases," reasonable attorney's fees. See Louis Vuitton Malletier S.A., 676 F.3d at 105-06. The "key" to whether a case is "exceptional" is "willfulness on the part of the defendant." Id. at 111. Costs and fees are available in conjunction with either actual or statutory damages under the Lanham Act. See id. at 104.

Plaintiff is awarded $1,640.25 in costs. These costs consist of plaintiff's $400 filing fee, $100 bond for the issuance of a preliminary injunction, $345 for service to defendants, and $795.25 in court reporter fees for Stylianou's deposition.

Courts within the Second Circuit generally employ the "presumptively reasonable fee" (or "lodestar") method when setting attorney's fees awards. See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany & Albany County Bd. of Elections, 522 F.3d 182 (2d Cir. 2008); Century 21 Real Estate LLC v. Bercosa Corp., 666 F. Supp. 2d 274 (E.D.N.Y. 2009) (Lanham Act award).

Attorney's fees under the lodestar method are the product of a reasonable hourly rate and the reasonable number of hours required by the case. See Millea v. Metro-North R.R. Co., 658 F.3d 154 (2d Cir. 2011). A court must then determine whether this presumptively reasonable fee is subject to an upward or downward departure. See Cover v. Potter, No. 05-cv-7039, 2008 WL 4093043, at *6 (S.D.N.Y. Aug.29, 2008). The award should approximate "the rate a paying client would be willing to pay." Arbor Hill, 522 F.3d at 190.

Plaintiff's legal team is in-house. For purposes of the lodestar calculation, I therefore use a rate that counsel would have earned if they were acting in the capacity of outside counsel. See Video Cinema Films v. Cable News Network, Inc., Nos. 98-7128-30, 2004 WL 213032, at *6 (S.D.N.Y. Feb. 3, 2004).

Attorney's fees are determined in reference to the district in which the case was litigated. See, e.g., Simmons v. New York City Transit Auth., 575 F.3d 170 (2d Cir. 2009). The determination of prevailing rates "may, of course, include judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district." Farbotko v. Clinton Cnty. of New York, 433 F.3d 204, 209 (2d Cir. 2005).

It is my view that most of the cases discussing prevailing rates in this District are not of great utility in demonstrating the prevailing rates for this kind of case. That is because this District sees a great many civil cases that involve individual parties and areas of law – such as civil rights and employment – that, while of course important, constitute an entirely different market for legal services than commercial cases like this one. See, e.g., Fawzy v. Gendy, No. 12-cv-5580, 2013 WL 5537128 (E.D.N.Y. Oct. 6, 2013).

Given that this is a commercial litigation involving relatively high dollar amounts and an appropriation of intellectual property that could have happened to any well-known bank in the City, plaintiff is entitled to recover the rate that a substantial commercial litigation firm would reasonably have charged plaintiff to enforce its rights in its intellectual property and its reputation. See, e.g., OZ Mgmt. LP v. Ozdeal Inv. Consultants, Inc., No. 09-cv-8665, 2010 WL 5538552, at *3-4 (S.D.N.Y. Dec. 6, 2010), report and recommendation adopted, 2011 WL 43459 (S.D.N.Y. Jan. 5, 2011).

Plaintiff had a team of four lawyers work on this case. Those who appeared conducted themselves with competence and professionalism. Daniel Wiig, in-house counsel, spent 99.25 on the case; Neysa Alsina, in-house counsel, spent 19.25 hours on the case; Philip Veltre, Deputy General Counsel, spent 23 hours on the case; and Thomas Siciliano, General Counsel, spent 2.75 hours on the case. Each of the above stated hourly totals is based on contemporaneous time sheets, which I have reviewed. See Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148 (2d Cir. 1994). Based upon plaintiff's submission, there is no reason to conclude that any of these hours were unreasonable or should be excluded.

Plaintiff seeks a combined rate of $610.50 per hour for all four of the in-house attorneys who worked on the case, including the two who appeared of record. However, I assess each attorney's reasonable hourly rate independently. Mr. Wiig served as lead counsel. From their time records, it appears that Ms. Alsina's activities on this case included support activities like factual investigation and legal research, as well as drafting, and that Mr. Veltre supervised the litigation on behalf of the plaintiff institution. Based on my familiarity with the rates charged by commercial litigators in this district, and judicial notice of similar cases, e.g. OZ Mgmt. LP, 2010 WL 5538552, at *3-4, I find that a reasonable rate for the work performed on this case by Ms. Alsina would be $400 per hour; by Messrs. Wiig and Veltre, $500 per hour; and by Mr. Siciliano, apparently the General Counsel of a large financial institution, $650 per hour. That results in a fee award of $70,612.50.

Defendants concede that "plaintiff should be awarded court costs and reasonable attorney's fees," but (of course) they suggest a lower figure. However, they do not offer anything in the way of serious support for a reduction. First, defendants appear to suggest that plaintiff is not entitled to recovery on its Lanham Act claim because it did not expressly demand

14

fees in that section of the complaint. That proposition is not supported by any authority of which I am aware. Defendants also suggest in passing that this is not an "exceptional case," but – for the reasons discussed in detail above – it clearly is. See Louis Vuitton Malletier S.A., 676 F.3d at 111. Defendants also seem to suggest that I should exclude hours that were "excessive, redundant, or otherwise unnecessary to the litigation," see Flanagan, 2014 WL 4954615, at *11, but they do not point to any entries in plaintiff's contemporaneous records that they believe fall into this category. It is therefore not up to me to parse each time entry to see if there is any support for defendant's argument. See Clayton v. Steinagel, No. 11-cv-379, 2012 WL 6624203, at *2 (D. Utah Dec. 19, 2012). Nevertheless, having reviewed the time records, I see no such excesses.

## CONCLUSION

Plaintiff is entitled to recover $330,000 in statutory damages, $1,640.25 in court costs, and $70,612.50 in attorney's fees. Plaintiff is further entitled to permanent injunctive relief. Plaintiff is directed, within seven (7) days of the entry of this Order, to settle a Final Judgment and Permanent Injunction, awarding the relief set forth herein, on fourteen (14) days' notice to defendants.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      August 27, 2015